KETHLEDGE, Circuit Judge,
dissenting.
Even the State admitted, in oral argument for this case, that the sexual conduct at issue here — rough, three-way sex involving the complainant, the defendant, and another man — would appear “facially coercive” to a jury. The charged conduct would appear that way, that is, unless the jury was told that the complainant had consented to virtually identical conduct with Gagne and another man just four weeks earlier, and had proposed the same thing to Gagne and another man on a third occasion. Viewed in that context, conduct that at first seemed facially coercive to the jury might not have seemed coercive at all, at least not on its face. That is a critical difference in a rape trial in which the only issue was consent and the stakes ran as high as 45 years in prison. Yet the state courts barred Gagne from presenting evidence of these incidents on relevance grounds.
The logic of the State’s concession is that, as a practical matter, the burden was on Gagne at trial to prove that the charged conduct was consensual. And so the question presented by Gagne’s case is a narrow one: whether, in a trial where the charged conduct is facially coercive and the only issue is consent, evidence that the complainant had consented to the same kind of conduct with the defendant, only a handful of weeks before, is indispensable to his defense. Under the Supreme Court’s caselaw — and by any measure of fairness and common sense — the clear answer to that question is yes.
*528 I.
At the outset, it is important to make clear what this case is not about. The State and its amici argued in seeking rehearing, and continue to argue before the court en banc, that a decision to affirm the district court’s issuance of the writ in this case would “effectively abrogate every rape-shield law in this circuit.” Seldom in legal analysis is an assertion so demonstrably false.
Begin with the fact that the State does not even venture to assert that Michigan’s rape-shield statute (or any other) actually bars admission of the evidence at issue here. There is a reason for that omission. The core of any rape-shield law is its proscription against evidence of past sexual activity by the victim. But every one of those laws contains an exception for evidence of the victim’s prior sexual activity with the defendant. And that is precisely the kind of evidence at issue here. Michigan’s statute excepts from its proscription “[ejvidence of the victim’s past sexual conduct with the actor.” Mich. Comp. Laws § 750.520j(l)(a). Ohio’s statute does the same. See Ohio Rev.Code § 2907.02(D) (excepting evidence of “the victim’s past sexual activity with the offender”). So does the Tennessee rule. See Tenn. R. Evid. 412(c)(3) (allowing admission of evidence if “sexual behavior was with the accused, on the issue of consent”). The Kentucky rule affirmatively provides that “evidence of specific instances of sexual behavior” between the alleged victim and defendant “is admissible” if offered to prove consent and otherwise admissible under the rules. See Ky. R. Evid. 412(b)(1)(B) (emphasis added). The federal rule does the same. See Fed.R.Evid. 412(b)(1)(B).
And thus the State’s rhetoric runs into a reality of judging: it is hard to invalidate a provision that does not even apply to the case at hand. It is harder still to invalidate provisions that actually support the result reached in the case. Here, none of the rape-shield statutes in our circuit would bar admission of the evidence at issue, and the federal and Kentucky rules would affirmatively allow its admission. The State does not even dispute the point. The conclusion that affirmance of the district court’s judgment would not “invalidate” these statutes follows almost by mathematical proof.
The various arguments offered in support of the State’s position on rehearing, in contrast, do not offer anything at all like mathematical proofs. What they offer is scarecrow rhetoric. We are told, for example, that affirmance of the district court’s judgment would deal the statutes a “serious blow,” and indeed would “call into question the ordinary application of the rape-shield statute” — this, in a case where the statute’s bar would not apply in the first place. The arguments’ driving impulse, it seems, is that we ought to have a penumbra of inadmissibility around the zone of inadmissibility that the rape-shield statutes actually prescribe — lest anyone ever infer that we undermine those statutes in vindicating a defendant’s constitutional rights. The arguments’ premise, fundamentally, is that certain statutory values are so important as to trump constitutional ones. The premise is viable only to the extent it remains unstated. There is no rape-defendant exception to the Constitution.
But the conflict the State posits is a false one. The dynamic between a defendant’s constitutional rights and the interests served by the rape-shield laws is not a zero-sum game. The laws themselves strike a balance between the important interests they serve, on the one hand, and evidence critical to the defense, on the other. And thus our concern for a defen *529 dant’s constitutional rights does not amount to a lack of concern for the interests served by the rape-shield laws. We honor these laws when we respect the balance they strike. It is the State’s position, and not ours, that imperils these laws, by giving them a scope beyond their terms, and thus bringing them into conflict, needlessly, with constitutional values.
Equally misdirected is the claim that a decision to affirm the district court would trample upon the policies that animate these laws. The argument is that, in deeming the evidence here indispensable, the district court indulged in forbidden inferences whose eradication was a principal aim of these laws. But again the argument is let down by the laws. Everyone agrees that these laws are supported by important state interests. (The extent to which those interests are implicated in a particular case, as discussed below, is another matter.) And yet, notwithstanding those important interests, every one of these laws contains an exception for evidence of consensual sex with the defendant. These laws must infer something very important about such evidence; and they do so especially in cases — like this one — where consent itself is the issue. The rape-shield laws are more nuanced than the State gives them credit for. The laws’ own inference is that, in some cases, evidence of past consensual sex with the defendant is highly relevant to the issue of consent in the incident giving rise to the charge. Here, the district court merely concluded that this was such a case. In doing so, the district court did not abrogate the policies reflected in these laws; it applied them.
II.
The State otherwise argues that the Michigan Court of Appeals’s decision in this case falls within the latitude afforded a state court under AEDPA. As relevant here, the statute limits habeas relief to cases where the state court’s decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]” 28 U.S.C. § 2254(d). I am well-aware that this standard is difficult to meet. But it is not impossible to meet; and it is met here.
A.
During his rape trial, Gagne sought to admit evidence that, “within 30 days of the charged offense,” the complainant had engaged in three-way sex with Gagne and another man, Ruben Bermudez, and that “the way that event took place is almost identical to the way that the events charged in this case took place.” 1/2/01 Hearing Tr. at 18-19. Gagne’s counsel stated that both Bermudez and Gagne himself would testify to that effect. Gagne also sought to admit evidence that, within approximately two months of the charged conduct, the complainant had proposed the same kind of conduct to Gagne and his father. The trial court excluded all this evidence on grounds that it was more prejudicial than probative.
In his direct appeal, Gagne claimed that the exclusion of this evidence violated his procedural due-process right to present a complete defense and his Sixth Amendment right to confront the witnesses against him. The Michigan Court of Appeals held that these claims were merit-less. The decisions of the Supreme Court of the United States show otherwise.
B.
“Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amend *530 ment, the Constitution guarantees criminal defendants ‘a meaningful opportunity to present a complete defense.’ ” Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). At the same time, trial judges must make “dozens, sometimes hundreds” of evidentiary decisions throughout the course of a typical case; and “the Constitution leaves to the judges who must make these decisions ‘wide latitude’ to exclude evidence that is ‘repetitive ..., only marginally relevant’ or poses an undue risk of ‘harassment, prejudice, [or] confusion of the issues.’ ” Crane, 476 U.S. at 689-90, 106 S.Ct. 2142 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (alterations and omissions in original). The point of cases like Crane, however, is not that this latitude exists. The point is that the Constitution places limits upon it.
1.
One case that marks out those limits is Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). There, Leon Chambers had been charged in state court with the fatal shooting of a police officer, Aaron Liberty. After Chambers had been charged, another man, Gable McDonald, gave a sworn confession that he had shot the officer. But McDonald repudiated his confession a month later, claiming that he had only made the confession as part of a deal to share the proceeds of a lawsuit that Chambers allegedly planned to bring as a result of Chambers’s own injuries in the melee in which the officer was killed. The State proceeded with Chambers’s prosecution. His defense was that McDonald shot Officer Liberty. At trial, the court allowed Chambers to admit some evidence in support of that defense, including McDonald’s written confession, a witness’s testimony that he saw McDonald shoot the officer, another witness’s testimony that he saw McDonald with a gun after the shooting, and the testimony of a third witness who contradicted McDonald’s alibi. But the trial court excluded testimony from three witnesses to the effect that, in separate conversations with each of them, McDonald had confessed to the killing. The court also refused to allow Chambers to cross-examine McDonald as an adverse witness. The jury eventually convicted Chambers of murdering Officer Liberty.
Chambers argued in the Supreme Court that the trial court’s evidentiary decisions had violated his procedural due-process right “to a fair opportunity to defend against the State’s accusations.” Id. at 294, 93 S.Ct. 1038. The State there appeared to respond much as the State does here: trial courts have wide latitude to exclude evidence at trial; the court’s decisions were based upon state evidentiary rules that serve important interests; and, given the evidence that the trial court did admit, its decisions adverse to Chambers did not render his trial fundamentally unfair.
The Supreme Court rejected the State’s arguments. The Court said that “[t]he rights to confront and cross-examine witnesses and to call witnesses in one’s own behalf have long been recognized as essential to due process.” Id. The Court described these two rights — confrontation and calling witnesses — in similar terms. Although the right to confront and cross-examine is “essential and fundamental” to a fair trial, the Court said, the right “may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.” Id. at 295, 93 S.Ct. 1038. But the right’s “denial or significant diminution calls into question the ultimate in *531 tegrity of the fact-finding process and requires that the competing interest be closely examined.” Id. (internal punctuation omitted). Similarly, the Court said that “[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.” Id. at 302, 93 S.Ct. 1038. And so the Court took a close look at the competing interests with respect to that right as well. Id.
In gauging these interests, the Court delivered a notably realistic assessment of how Chambers’s ability to defend himself was affected by the trial court’s decisions in his case. The Court observed that the trial boiled down to a credibility contest between Chambers and McDonald, since, “in the circumstances of this case, McDonald’s retraction [of his confession] inculpated Chambers to the same extent that it exculpated McDonald.” Id. at 297, 93 S.Ct. 1038. And in that contest Chambers was significantly, though by no means totally, disabled. His “predicament” as a result of the trial court’s rulings, the Court said, was that “he was unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald’s repudiation and demonstrated his complicity.” Id. at 294, 93 S.Ct. 1038. It was true, the Court said, that the evidence admitted at trial — McDonald’s written confession, testimony from one witness contradicting McDonald’s alibi, testimony from another who said he had seen McDonald shoot the officer firsthand — had “chipped away” at McDonald’s credibility. Id. Thus the State argued in effect — -just as the amici States argue here — that the trial court had split the difference, and that the Court ought to leave things where they were. But the Supreme Court chose not to decide the case upon a mere recitation of platitudes. It instead took a careful look at all of the evidence, admitted and excluded alike, and analyzed impartially the effect of the trial court’s decisions upon the dynamic at trial. Its conclusion was based upon common sense: “Chambers’ defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald’s statements to cross-examination or had the other confessions been admitted.” Id.
Against these interests, the Court weighed the State’s interests in support of the trial court’s decisions. The trial court had excluded McDonald’s confessions to the three witnesses on hearsay grounds. As a generic matter, the Court recognized, the interests supporting that rule are significant: “perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay[.]” Id. at 302, 93 S.Ct. 1038. But the court did not weigh those interests generically; it weighed them “under the facts and circumstances of this case[.]” Id. at 303, 93 S.Ct. 1038. And having done so, the Court determined that the interests supporting exclusion of the three confessions were slight, primarily because the confessions themselves were trustworthy — again in light of the particular facts and circumstances of Chambers’s case. Id. at 302, 93 S.Ct. 1038.
The Court likewise made short work of the trial court’s decision to bar Chambers from examining McDonald as an adverse witness, which had been based on Mississippi’s “voucher rule.” Id. at 295-96, 93 S.Ct. 1038. Again looking at the specific facts of his case, the Court said that “McDonald’s testimony was in fact seriously adverse to Chambers[,]” regardless of who put McDonald on the stand. Id. at 297, 93 S.Ct. 1038. Thus, the Court held, “[t]he ‘voucher’ rule, as applied in this case, plainly interfered with Chambers’ right to defend against the State’s charges.” Id. at 298, 93 S.Ct. 1038. The Court concluded: *532 “the exclusion of this critical evidence, coupled with the State’s refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process.” Id. at 302, 93 S.Ct. 1038.
a.
The parallels here are not hard to discern. This case too boiled down to a credibility contest between the defendant and another witness. In this case too the defendant was allowed to admit some of the evidence he proffered at trial — specifically, testimony concerning the so-called “Tony’s Lounge” incident, which was a five-way orgy in which the complainant consensually participated, and which the State and the Michigan Court of Appeals said was an adequate substitute for the three-way evidence that the trial court excluded. (To be clear, however, the record indicates that this incident was actually a room full of two-way sex, during which the complainant engaged in sex with Gagne and Swathwood sequentially rather than at the same time, see Joint App’x at 43-46; and, as shown below, the State itself characterized the incident as sequential two-way sex in its closing argument to the jury.) The issue here, then, is no different from the issue in Chambers: Whether the excluded evidence lost its “critical” nature in light of the evidence that the trial court did admit. That, I suggest, is the nub of this appeal.
The issue, in terms specific to this case, is whether the admission of the Tony’s Lounge evidence rendered the prior three-way incidents merely “cumulative[,]” as the State now argues, rather than critical. But on this issue the State has virtually made Gagne’s case for him. To do more than “chip[] away” at the State’s case against him, Chambers, 410 U.S. at 294, 93 S.Ct. 1038, Gagne had to do more than demonstrate the complainant’s willingness to engage in sequential sex with Gagne and another man. Instead, he had to demonstrate the complainant’s willingness specifically to engage in the kind of facially coercive three-way sex (with Gagne) involved in the charged incident. This distinction has been the prosecution’s battering ram throughout this litigation. Consider, for example, how in closing argument the prosecution itself distinguished the Tony’s Lounge incident from the charged conduct in this case:
That situation [the Tony’s Lounge incident] did not involve, ladies and gentlemen, two men. That situation did not involve penetration of her anus multiple times, her vagina, multiple times, and oral sex multiple times. It did not involve physical abuse, which is what is charged here, and what the physical and testimonial evidence show occurred.
2/5/01 Trial Tr. at 12-13 (emphasis added).
To which I would say: Precisely. The Tony’s Lounge evidence was not a fair substitute for the excluded evidence precisely because of the very distinctions called out by the prosecution in seeking (and obtaining) a conviction in this case. That the complainant would engage in comparatively benign sequential sex in the Tony’s Lounge incident does not come close to refuting the prosecution’s argument that she would not consent to what the State itself calls the “brutal” three-way sex at issue here. State’s Supp. Br. at 12. To offer some bland assurance to the contrary is to ignore reality, and to apply the Constitution’s principles to a fairyland trial rather than the trial that actually occurred.
The State makes this point even more emphatically in its supplemental brief to this court — albeit inadvertently. The State argues:
[T]he dissimilarity between the charged act and the prior excluded acts cannot *533 be emphasized enough because of the violent nature of the rape.... [T]here is no evidence that the alleged threesome with Bermudez involved the type of sexual activity or the type of brutality that the charged incident involved. There was no offer of proof that [the complainant] engaged in anal sex, that she allowed a bottle to be inserted in her rectum and vagina, that she allowed a whip to be used, or that she allowed or enjoyed being hit in the buttocks. There is nothing in the excluded evidence that indicates she would consent to the brutal sex that took place on the night of the charged incident. Thus, it is only minimally relevant.
State’s Supp. Br. at 12 (emphasis added). The major premise of the State’s argument here, as with its closing argument at trial, is that the complainant’s participation in ■won-brutal sex — such as the Tony’s Lounge incident — is “only minimally relevant” to whether she would have consented to “the brutal sex that took place on the night of the charged incident.” (More on that below.) The argument’s minor premise is that the Gagne-Bermudez incident was not brutal in the ways that the charged incident was. Thus, the State concludes, the Gagne-Bermudez incident was “only minimally relevant.”
The problem with the State’s syllogism is that it has its facts wrong. Gagne’s counsel stated that Gagne and Bermudez were each ready to testify that their three-way sex with the complainant — less than 80 days before the charged incident — was “almost identical to the way that the events charged in this case took place.” See 1/2/01 Hearing Tr. at 18-19 (emphasis added); see also id. at 19 (noting that the prior incident was “nearly identical in most regards ”) (emphasis added).[1] Non-brutal three-way sex is not “almost identical” or “nearly identical” to brutal three-way sex. And thus it is simply not an accurate reading of the record to say that the Bermudez incident, as described in the proffer, was less brutal than the charged incident.
Moreover, Gagne’s counsel stated in a Motion for Reconsideration that, when the excluded testimony is considered “in conjunction ” with the evidence that the court did admit (including testimony relating to the use of sex objects, such as the whip and blue champagne bottle), the Bermudez incident “establishes] as clear a pattern as can be imagined which is similar to what is alleged here as non-consensual conduct.” R. 23-4 at 20 (emphasis added). The trial court did admit testimony that the complainant had used the whip and bottle during sex generally; but the true power of that testimony comes from its combination (or “conjunction”) with the excluded testimony regarding the Bermudez incident — which then could have been shown to have been “almost identical to the events charged in this case.” The State simply overlooks these aspects of the record in its brief.
And so the State should reap the whirlwind here. It is undisputed that evidence of the complainant’s consent to non-brutal sex was only minimally relevant to Gagne’s ability to defend himself at trial. The Tony’s Lounge evidence was precisely that. Per the State’s own arguments, that evidence was no substitute for the evi *534 dence that the trial court excluded in this case.
It follows that the excluded evidence was “critical” to Gagne’s defense. Chambers, 410 U.S. at 302, 93 S.Ct. 1038. What Gagne faced was a theory of res ipsa loquitur as applied to a rape case: the brutal and facially coercive nature of the charged conduct spoke for itself at trial, to the effect that the conduct was not consensual. That undisputed fact severely disadvantaged Gagne in the credibility contest upon which his trial turned. His only chance of defending himself was to admit evidence that the complainant had consented to in one instance, and proposed in another, almost identical conduct with Gagne and another man — and moreover that the complainant had done so just weeks before the charged conduct here. Absent this evidence, Gagne’s “defense was far less persuasive than it might have been had he been given an opportunity” to admit this evidence and then cross-examine the complainant on the basis of it. Id. at 294, 93 S.Ct. 1038. That parallel with Chambers, I think, cannot be seriously disputed. Indeed I think that Leon Chambers was better off in his trial than Gagne was in his — since in Chambers’s credibility contest he at least had McDonald’s written confession and a witness’s firsthand testimony that McDonald had done the shooting. Gagne, hy comparison, had next to nothing at all.
The only evidence with which Gagne could realistically defend himself — evidence, I might add, that suggests a substantial possibility that he is innocent— was the evidence that the trial court excluded. Even when viewed deferentially, the court’s decision to strip that evidence out of the case “plainly interfered with [Gagne’s] right to defend against the State’s charges.” Id. at 298, 93 S.Ct. 1038. What was left was an empty husk of a trial — at whose conclusion came a prison sentence of up to 45 years.
b.
Chambers instructs that we must look at not only the interests supporting admission of Gagne’s evidence, but also the interests supporting its exclusion. I begin with the rationale offered by the Michigan Court of Appeals for the exclusion of Gagne’s evidence. That court did not even discuss federal constitutional law in rejecting Gagne’s claim that the exclusion of the subject evidence violated his due-process right to present a complete defense. What the court did say was that “the complainant’s willing participation” in the Gagne-Bermudez three-way was “not probative” of whether she willingly participated in the Gagne-Swathwood three-way (the charged conduct) four weeks later, because “the threesome involving Bermudez occurred while the complainant and Gagne were still dating.” Mich. Ct.App. Op. at 3. (Apparently they broke up a week or two later.) The court also noted that the third participant in the charged conduct was “Swath-wood, not Bermudez.” Id. The court held that evidence of the complainant’s proposed three-way with Gagne and his father was “not relevant” for essentially the same reasons.
As an initial matter, none of this reasoning makes much sense even on its own terms. That the complainant and Gagne were “dating” at the time of the Gagne-Bermudez incident and the Gagne-Gagne, Sr., proposal is not a serious reason to distinguish those events, for purposes of the complainant’s consent, from the Gagne-Swathwood incident four weeks later. The court of appeals’s assumption, apparently, was that the complainant and Gagne were less likely to engage in consensual sex once their relationship had ended. Generically, that assumption might *535 make sense. On this record, it does not— because the assumption is affirmatively refuted by the undisputed fact that the charged incident began with consensual oral sex between the complainant and Gagne.
Nor is there any basis to distinguish the excluded incidents from the charged one on the ground that the excluded incidents involved Bermudez and Gagne, Sr., respectively, whereas the charged one involved Swathwood. Here the court’s assumption, apparently, was that the complainant was for some reason more willing to consent to group sex with Bermudez or Gagne, Sr., as the third participant, than she was with Swathwood. The court cited no basis for that assumption. And again the record refutes it, since the complainant undisputedly engaged in consensual sex with Swathwood during the Tony’s Lounge incident. Thus, even when viewed deferentially, none of this reasoning describes an interest remotely as significant as Gagne’s interest in defending himself at trial.
But the State suggests that other interests lurk in this appeal. The interests are those advanced by Michigan’s rape-shield law. As a generic matter, I entirely agree that Michigan’s rape-shield law (like the hearsay rule in Chambers) protects important state interests in the vast majority of cases in which it is implicated. We cast no aspersion upon that law when we say that a defendant was denied a fair trial in a case in which the law’s proscription does not even apply. But more to the point: Chambers makes clear, as discussed above, that the interests supporting exclusion of Gagne’s evidence must be assessed not generically, but rather in light of “the circumstances of this case.” 410 U.S. at 297, 93 S.Ct. 1038.
In this trial, I respectfully submit, there was virtually nothing left for the rape-shield statute to protect. As an initial matter, this case only weakly implicates the interests protected by the statute, since the statute’s terms did not even bar the excluded testimony, but instead left its admission to the discretion of the Ingham County Circuit Judge. See Mich. Comp. Laws § 750.520j(l)(a). And it is hard to see what was left of those interests, such as they were in this case, given the evidence of sexual activity (albeit non-brutal) and drug use that was admitted at trial. The only sense in which Gagne’s evidence was “cumulative,” I submit, was as to whether its admission in this trial would have diminished those interests any further.
And so we must decide whether the court of appeals’s decision in this case reflects an unreasonable application of Chambers. For all the reasons described above — the palpably indispensable nature of this evidence to Gagne’s defense, the minimal interests supporting its exclusion in the circumstances of this case, and the State’s own arguments as to why the Tony’s Lounge evidence was no substitute — I do not think that “fairminded jurists” could conclude that the state court’s decision here was consistent with Chambers. See generally Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011). Indeed I submit that the state court’s decision was worse than an unreasonable application; it was arguably “contrary to” Chambers. See 28 U.S.C. § 2254(d)(1). A state court’s decision is contrary to Supreme Court precedent if the state court “ ‘confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a’ ” different result. Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) (citation omitted). Aside from the nature of the offenses, this case is indistinguishable from Chambers: Both state courts *536 relied on flimsy evidentiary rationales to exclude evidence that was critical to resolving a credibility dispute, all on the mistaken theory that the defendant was allowed to introduce some similar evidence in his defense.
Even genuine deference has its limits. They were passed here. Chambers requires issuance of the writ in this case.
2.
The Supreme Court’s decision in Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 686 (1986), confirms that conclusion. Like Chambers, Crane requires consideration of two factors in determining whether the exclusion of evidence denies a defendant the right to present a complete defense. The first is the extent to which the evidence was “central to the defendant’s claim of innocence.” Id. at 690, 106 S.Ct. 2142. The second is the extent to which its exclusion was supported by a “valid state justification])]” Id.
In Crane, the defendant was convicted of murder. He was 16 years old at the time of the crime. There was “no physical evidence to link him” to the murder. Id. at 691, 106 S.Ct. 2142. The State’s evidence of guilt was primarily Crane’s own confession. Crane sought to discredit the confession with testimony that “he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession.” Id. at 685, 106 S.Ct. 2142. That evidence, the Supreme Court said, was “highly relevant” to the reliability and credibility of the confession, which again was the State’s primary evidence of guilt. Id. at 691, 106 S.Ct. 2142. And the Court saw no justification for excluding the evidence under the circumstances presented there. The Court held, unanimously, that the exclusion of Crane’s testimony violated his right to present a complete defense.
The analysis flows in the same channels here. In both Crane and this case, the excluded evidence was “central to the defendant’s claim of innocence.” Id. at 690, 106 S.Ct. 2142. The excluded evidence was central in each case because the cases themselves were alike in a critical respect: given the res ipsa nature of the prosecution’s evidence — a confession there, the facially coercive nature of the charged conduct here — the burden was on the defendant, as a practical matter, to demonstrate his innocence at trial. The Supreme Court described Crane’s predicament as follows: “[Stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?” Id. at 689, 106 S.Ct. 2142. The dynamics of Gagne’s trial were no different: stripped of the ability to introduce evidence that the complainant had consented to brutal three-way sex in the recent past, Gagne was effectively disabled from demonstrating to the jury that she had consented to nearly identical brutal sex in the charged incident.
In both this case and Crane, the excluded evidence was indispensable to the defendant’s ability to demonstrate his innocence. And in each case the State’s interests in excluding the evidence were minimal. Thus, for essentially the same reasons already discussed with respect to Chambers, Crane supports issuance of the writ in this case.
3.
The Supreme Court’s decision in Olden v. Kentucky, 488 U.S. 227, 109 S.Ct. 480, *537 102 L.Ed.2d 513 (1988) (per curiam), is significant for purposes of Gagne’s claim under the Confrontation Clause. Like this case, Olden was a rape case. There, the complainant had been drinking at a local bar with James Olden and his co-defendant, Charlie Ray Harris. The three of them left the bar in Harris’s car. The complainant later told police that Harris had stopped the car at some location and held her down as Olden raped her at knife-point. She said that Harris and Olden then drove her to a dump, where two other men joined them and Olden ■ raped her again. Finally, Harris dropped off the complainant near the home of Bill Russell, with whom she was then having an extramarital affair. Russell emerged from his home as the complainant stepped out of Harris’s car. She immediately told him that she had been raped by Olden and Harris.
At trial, Olden and Harris “asserted a defense of consent.” Id. at 229, 109 S.Ct. 480. Specifically, they claimed that the complainant had engaged in consensual sex with them and then “concocted the rape story to protect her relationship with Russell, who would have grown suspicious upon seeing her disembark from Harris’ car” in the early-morning hours. Id. at 230, 109 S.Ct. 480. At trial, two other men testified that they had joined the group after the alleged rape occurred, and that the complainant “did not appear upset.” Id. at 229, 109 S.Ct. 480. One of those witnesses also testified that the complainant had approached him at the bar that evening and said “that she was looking for a black man with whom to have sex.” Id. (The defendants in Olden were black.) A third “independent witness” also testified that “he had seen [the complainant], Harris, and [Olden] at a store called Big O’s on the evening in question, that a policeman was in the store at the time,” and that the complainant had “made no attempt to signal for assistance.” Id. When the complainant herself testified at trial, Olden’s counsel cross-examined her concerning “a number of inconsistencies in [her] various accounts of the alleged crime.” Id. at 228, 109 S.Ct. 480. Specifically, the complainant “originally told the police that she had been raped by four men.” Id. Later, she claimed that only Olden and Harris had raped her; and at trial, “she contended that [Olden] was the sole rapist.” Id. In addition, “while [the complainant] testified at trial that [Olden] had threatened her with a knife, she had not previously alleged that [he] had been armed.” Id.
But the trial court barred Olden from cross-examining the complainant with one piece of evidence in particular: the fact that she was living with Russell at the time of trial. Olden contended at trial that evidence of their cohabitation was “crucial” to Olden’s efforts to demonstrate the complainant’s “motive to lie[.]” Id. at 230, 109 S.Ct. 480. But the trial court “granted the prosecutor’s motion in limine to keep all evidence of [the complainant’s] and Russell’s living arrangement from the jury.” Id. Olden was thereafter convicted of forcible sodomy and sentenced to 10 years in prison.
The Kentucky Court of Appeals affirmed, holding that the cohabitation evidence was properly excluded. Its reasoning marked the path of the trial court’s reasoning in excluding Gagne’s evidence here. Specifically, the Kentucky court held that the cohabitation evidence “was not barred by the State’s rape shield law[,]” but that “its probative value was outweighed by its possibility for prejudice.” Id. (internal punctuation and alterations omitted). The court went on to say that the cohabitation evidence could “have created extreme prejudice against [the complainant]” with the jury, because she “was white and Russell was black.” Id. at *538 231, 109 S.Ct. 480 (internal punctuation omitted).
The Supreme Court summarily reversed, holding that “[t]he Kentucky Court of Appeals failed to accord proper weight to [Olden’s] Sixth Amendment right to be confronted with the witnesses against him.” Id. (internal punctuation omitted). “That right,” the Court made clear, “includes the right to conduct reasonable cross-examination.” Id. The right was violated in Olden’s case, the Court reasoned, because “[i]t is plain to us that ‘a reasonable jury might have received a significantly different impression of the witness’ credibility had defense counsel been permitted to pursue his proposed line of cross-examination.’ ” Id. at 232, 109 S.Ct. 480 (quoting Van Arsdall, 475 U.S. at 680, 106 S.Ct. 1431) (internal alterations omitted).
Again the parallels here are not hard to discern. In both cases the charge was rape. Both cases boiled down to a credibility contest in which the sole issue was consent. In both cases the complainant’s “testimony was central, indeed crucial, to the prosecution’s case.” Id. at 233, 106 S.Ct. 1431. In both cases the defendant sought to impeach the complainant’s testimony with evidence that the state courts chose to exclude. In both cases the state courts held that the evidence was not barred by the State’s rape-shield law, but that it was more prejudicial than probative. And in both cases the defendant was permitted to cross-examine the complainant based upon other evidence in the case.
Thus, in this case, the Michigan Court of Appeals confronted a “ ‘set of facts that are materially indistinguishable from’ ” a decision of the Supreme Court, namely Olden. Price, 538 U.S. at 640, 123 S.Ct. 1848 (citation omitted). Yet the Michigan Court of Appeals “ ‘arrive[d] at a [different] result,’ ” id., than the Supreme Court did. In doing so, the Michigan court reasoned that, “in light of the other evidence of the complainant’s past sexual conduct that the trial court did admit, we reject defendants’ argument that their rights of confrontation compelled the admission of this evidence^]” Mich. Ct.App. Op. at 4. The court then went on to say that the jury had “heard about” the Tony’s Lounge incident and that the subject incident began with consensual oral sex between the complainant and Gagne.
The “other evidence” cited by the Michigan court does not even begin to distinguish this case from Olden. The Tony’s Lounge incident was only minimally helpful to Gagne’s defense, as shown above. The same is true for the consensual oral sex at the beginning of the charged incident, since that sex too was not “brutal” or facially coercive. Olden’s impeachment evidence looks stronger by comparison: it included the numerous changes in the complainant’s own account of the incident, plus the testimony of three witnesses — one of whom was unconnected with the parties to the case, and all of whom corroborated Olden’s account and contradicted that of the complainant. In credibility contests in which the issue was consent, Olden held a markedly better hand than Gagne did. And otherwise I think it nearly indisputable that the evidence excluded in Gagne’s case was just as important to his defense, if not more so, than the evidence excluded in Olden’s case was.
For all of these reasons, I do not think that “fair minded jurists” (which I use only as a term of art here) could reconcile the Michigan Court of Appeals’s reasoning with that of the Supreme Court in Olden. In this case, as in Olden, it is plain that “ ‘a reasonable jury might have received a significantly different impression of the [complainant’s] credibility had defense counsel been permitted to pursue his proposed line *539 of cross-examination. Olden, 488 U.S. at 232, 109 S.Ct. 480 (citation and internal alterations omitted). Indeed, as noted above, the way the trials proceeded in each case was so similar that the Michigan court’s decision was arguably “contrary to” the Supreme Court’s decision in Olden.[2] See 28 U.S.C. § 2254(d). But in any event the Michigan court’s decision was an unreasonable application of Olden; and that is enough to require issuance of the writ.
In this case, as in Chambers, a decision to grant relief would “establish no new principles of constitutional law.” 410 U.S. at 302, 93 S.Ct. 1038. It would only require us to apply long-established principles in a specific context in which the Supreme Court has already told us they apply. In Michigan v. Lucas, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the Court said that the exclusion of the specific kind of evidence at issue here — evidence of past consensual sex between a rape defendant and the complainant — “unquestionably implicates the Sixth Amendment” and “diminishe[s]” the defendant’s rights “to confront adverse witnesses and present a defense[.]” Id. at 149, 111 S.Ct. 1743. Whether the diminution of those rights amounts to a violation of them, of course, depends “on the facts of th[e] case[.]” Id. at 153, 111 S.Ct. 1743.
Gagne’s rights were violated on the facts of this case. The Michigan courts unreasonably applied the Supreme Court’s precedents in holding the contrary. I respectfully dissent.

. At the prosecution's request, the parties stipulated to paraphrase these points during the hearing, because otherwise, the prosecution said, it would move to clear the courtroom. See id. at 16-17. We therefore should not hold against Gagne the fact that his lawyer did not enumerate the rough details that the State enumerated in the passage excerpted above from its brief.

. The plurality opinion is incorrect in its assertion that I have adopted an interpretation of "contrary to" that would find the standard met when "the state-court decision [was] simply erroneous or wrong.” Williams v. Taylor, 529 U.S. 362, 389, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Stevens, J., dissenting) (internal punctuation omitted). What I have tried to do, rather, is to analyze the factual and legal parallels between Olden and Chambers, on the one hand, and this case on the other — a task that the plurality does not even attempt. It is those parallels, and not a sense that the state court of appeals’s decision was "simply wrong,” that underlie my conclusion that the state court’s decision was arguably contrary to the relevant Supreme Court decisions (and more certainly an unreasonable application of them). The plurality, for its part, does little more than announce that the state court’s reasons were “legitimate”— which amounts to an assertion that the state court’s decision was simply right.